# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) No. 20-CR-240-F |
| | ) |
| BOBBY CHRIS MAYES, | ) |
| CHARLES GOOCH, and | ) |
| COURTNEY WELLS, | ) |
| | ) |
| Defendants. | ) |

## TRIAL BRIEF

The United States submits this trial brief to assist the Court in presiding over the trial of Defendants Bobby Chris Mayes, Charles Gooch, and Courtney Wells on charges related to their conspiracy to fraudulently obtain the approval of Lenders for indirect loans to customers of the Big Red Dealerships—Big Red Sports & Imports, Norman Mitsubishi, Mayes Kia, and Norman Yamaha. Mr. Mayes was the sole and/or majority owner of the Big Red Dealerships and affiliated companies. Mr. Gooch was the Vice President and/or part owner of the Big Red Dealerships and sole owner of related Norman Pawn & Gun ("NPG"), which was purportedly located in a building owned by Mr. Mayes. Ms. Wells was the Controller and/or part owner of the Big Red Dealerships and affiliated companies. In particular, Mr. Mayes, Mr. Gooch, and Ms. Wells were all owners of Trident Warranty Advisors ("Trident"). This brief outlines the anticipated testimony and discusses a few evidentiary issues that may arise during trial. The United States' proposed jury instructions

and motions in limine, previously filed, provide a more thorough discussion of legal authority for the standards that apply to the criminal charges here.

## FACTUAL SUMMARY

A federal grand jury indicted Defendants on twenty-five counts: (1) one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) twelve counts of wire fraud, in violation of 18 U.S.C. § 1344; (3) six counts of possessing, using, or uttering forged securities, in violation of 18 U.S.C. § 513(a); and (4) six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Doc. 1.)

1. <u>Conspiracy</u>. Count 1 alleges Defendants conspired to obtain millions of dollars of loan proceeds from twenty-three banks, credit unions, and automobile financing lenders (the "Lenders") based on: (1) material misrepresentations and omissions to the Lenders about the type, source, and amount of borrowers' down payments or vehicle trade-ins; and (2) unlawful payments and bribes paid to at least one financial institution employee designed to bypass the scrutiny the loan officer was obligated to provide before approving such loans. The conspiracy included a few different types of false statements and material omissions to Lenders.

*First*, Defendants, co-conspirators, and employees following their directions are alleged to have started by simply falsifying to the Lenders that purchasers had provided cash down payments, internally referred to as the "King Cash" program at the Big Red Dealerships. Although the Lenders were provided with deal documents showing customers gave the Big Red Dealerships cash, the Big Red Dealerships did not receive any equity from customers. On Big Red Dealership internal documents and computer systems, which

were not disclosed to Lenders, employees included notations that the "cash" was "King." This allowed the Big Red Dealerships to exclude such cash from internal accounting systems and commission calculations. The Lenders' agreements with the Big Red Dealerships expressly precluded the dealer from directly, and in most cases indirectly, providing the buyer's down payment.

The evidence at trial is expected to show that in 2014, one of the Big Red Dealerships' indirect lenders, Peak Acceptance ("Peak"), learned of alleged fraud that had occurred in connection with some of the deals that Peak had funded. Mr. Mayes disclosed the purported issue and attempted to resolve and limit the Big Red Dealerships' exposure to specific deals he identified for Peak. Peak refused to accept that initial resolution and instead launched its own investigation. The litigation was ultimately settled and resolved, but the lessons from Peak's investigation apparently taught the Big Red Dealerships a valuable lesson—their fraud needed to be concealed with a more formidable façade.

***Second***, Defendants orchestrated a scheme in which they convinced customers that the Lenders' required down payments could be satisfied by pawning almost anything at NPG, a company owned by Mr. Gooch, but initially funded by Mr. Mayes and purportedly located on property owned by Mr. Mayes. Customers were told that they could pawn virtually anything, regardless of its worth. As Ms. Wells explained in an e-mail to the Big Red Dealerships' accountants, with respect to these pawned items "we go ahead and classify as junk/scrapped" and the "only values assigned to these items are what [the lender] required for down payment on each deal, which is grossly higher than the items[s] actual value most of the time." Defendants' scheme resulted in paperwork being submitted

3

to the Lenders which showed that a cash down payment had been made by the customer. In reality, the customer did not provide that cash. Rather, a pawn ticket was generated at the dealership for whatever item(s) the customer agreed to "pawn." The pawn ticket showed a dollar amount for the item(s), but the amount shown simply matched the Lenders' cash down payment requirements, not the market value of the item(s), and that pawn ticket was never shown to the Lenders. For example, one such pawn slip showed the customer provided a Walmart brand Ozark Trails 12-person tent, which the pawn slip indicated was worth $6,000.00. After the Lender agreed to fund the loan, in reliance on the false paperwork, and disbursed the loan proceeds to the Big Red Dealership, Mr. Gooch would sign a check from NPG to the customer for the dollar amount written on the pawn ticket, e.g. $6,000.00 for the tent. He or Ms. Wells would then direct accounting office employees to forge the customer's endorsement on the back of the check and deposit the check into the respective dealership bank account.

The Big Red Dealerships would then either directly reimburse NPG with checks written by both Mr. Gooch and Ms. Wells. Or, the Big Red Dealerships would indirectly reimburse NPG by account transfers, mostly initiated by Ms. Wells, to Trident, a company owned by Mr. Gooch, Ms. Wells, and Mr. Mayes. On all but one occasion, Mr. Mayes, Mr. Gooch, or Ms. Wells then signed checks to NPG to complete the loop and reimburse NPG for the money that had been been spent on the purported pawn transactions. Ms. Wells told the Big Red Dealership accountants that no items were sold by NPG to third parties after their original purchase, and no employees were paid to work at NPG. She

explained of NPG, "[t]his company is simply for pass-through purposes, so we wouldn't want to show any profit."

***Third***, Defendants, co-conspirators, and employees operating at their direction falsified vehicle trade-ins to satisfy Lenders' requirements. Most often, this part of the scheme involved Defendants' employees convincing a customer that they could "trade-in" in a vehicle, whether it ran or not and whether or not the customer even owned the vehicle, but never actually provide the vehicle to the Big Red Dealerships. All the customer needed was a Vehicle Identification Number for a vehicle that did not have a lien on it. Defendants caused the paperwork submitted to the Lender to show a trade-in with an allowance value many times in excess of any conceivable value for the vehicle. The Defendants would then document a separate transaction, not disclosed to the Lenders, in which the customer would purchase the same "traded-in" vehicle back for a dollar. The fake trade-ins were used to meet the Lenders' down payment requirements to convince them to approve loans that they never would have approved otherwise.

***Finally***, every week Mr. Mayes and Ms. Wells provided cash to a Big Red Dealership employee and co-conspirator for him to bribe a loan officer at one Lender. At one of the Big Red Dealerships, Norman Yamaha, Mr. Mayes had identified a potential "loophole" to exploit at the expense of this Lender—a clause in their lending guidelines that purportedly would allow the Lender to loan the sales price for a vehicle, even if the sales price greatly exceeded the MSRP or market value of the vehicle. Big Red Dealership employees sold Yamaha products to customers at inflated prices and entered the inflated prices into Dealertrack, the online system for communicating with indirect lenders, as the

manufacturer's suggested retail prices ("MSRPs") when seeking loan approvals from a Lender. Big Red Dealership employees then generated purported "invoices" for such prices, which were provided to the Lender to support a loan to value ratio that would meet the Lender's guidelines. Big Red Dealership employees knew to direct loan applications for Norman Yamaha to a particular loan officer's attention. The cash bribes were provided by Mr. Mayes, Ms. Wells, and a co-conspirator to that loan officer in order to evade scrutiny and push through approvals of loans that might otherwise be rejected.

2. <u>Wire Fraud</u>. Counts 2–13 allege substantive wire fraud counts for 12 specific vehicle sales in which false information was provided to Lenders over the Internet, when the down payment was a purported pawn or a fake vehicle trade-in. The Indictment also charges aiding and abetting of these substantive counts. At trial, the Big Red Dealership documents submitted to Lenders will be offered as evidence. The customers will testify that the information on those documents was not accurate and that they did not actually provide cash or trade in a vehicle. NPG and Big Red Dealership documents that show the pawn transactions or $1 vehicle repurchases will be offered as evidence. Finally, representatives of the Lenders will testify that the loans would not have been approved had the reality of the transactions been disclosed to the Lenders.

3. <u>Forgery</u>. Counts 14–19 allege the possession, use, or uttering of forged securities based on six specific checks Mr. Gooch wrote to car buyers for pawned items, which were fraudulently endorsed by accounting department employees after the vehicle loans were funded, usually weeks after the car buyers had left the dealership. Big Red Dealership employees and co-conspirators will testify that the checks were not issued until

the loans were funded, sometimes weeks after the customer had left the Big Red Dealerships. Big Red Dealership employees will testify that they were directed by Mr. Gooch and Ms. Wells to forge the customer names on the back of the checks and deposit them into the Big Red Dealership accounts. The customers will testify that they never received the NPG checks, and the signatures on the back of the checks are not their signatures.

4. <u>Identity Theft</u>. Counts 20–25 allege aggravated identity theft in relation to the NPG check forgeries discussed above.

**POSSIBLE TRIAL ISSUES**

The United States has proposed stipulations to the defense to streamline the trial by not requiring records custodians for business records and other documents for which authentication is not in dispute. While defense counsel has generally indicated that they will likely to agree to such stipulations, no actual stipulations have been executed as of the filing of this brief. Even with a foundational stipulation, counsel may still object to admission of any exhibit under Federal Rules of Evidence 401 and 403.

1. <u>Mr. Gooch's prior sworn testimony</u>. Mr. Gooch testified in an unrelated arbitration. His prior statements are admissible under Rule 801(d)(2)(A), and the transcript is self-authenticating under Federal Rules of Evidence 902(2) and 902(4). *See, e.g.*, *Ball v. A.O. Smith Corp.*, 321 B.R. 100 (N.D.N.Y. 2005) (ruling that trial transcripts of unrelated proceedings were admissible and self-authenticating under 902(4) where the transcripts contained a court reporter's certifications). Further, Mr. Gooch's statements in his testimony are admissible pursuant to Federal Rule of Evidence 1007, as the testimony of a

7

party against whom the evidence is offered. The government anticipates admitting excerpts from the transcript that are relevant to the charges in the Indictment.

    2.    <u>Possible reliance on counsel defense</u>. To prove "a good faith reliance on counsel defense, the defendant must show (1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice." *United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005). "Good faith reliance on counsel, however, is not a complete defense, but is merely one factor a jury may consider when determining whether a defendant acted willfully." *Id.* A defendant bears the burden "to put forth sufficient evidence to support a proposed jury instruction" on advice of counsel. *United States v. Hill*, 643 F.3d 807, 851 (11th Cir. 2011).

Defendants have not suggested they will seek to offer an advice of counsel defense, but many witnesses have reported that the Big Red Dealerships had in-house counsel and outside counsel throughout the conspiracy. Further, certain witnesses have indicated that as the FBI's investigation intensified, Mr. Mayes directly contacted Lenders, purportedly to ask whether they had problems with the fraudulent practices alleged in the Indictment. In such communications, Mr. Mayes reportedly told Lenders that other Lenders had told him there was nothing wrong with such practices. Mr. Mayes may have also sought advice of counsel. However, advice of counsel requires the four elements described above, and it is critical that any such advice was received "***before*** taking action." *United States v. O'Connor*, 158 F. Supp. 2d 697, 728 (E.D. Va. 2001) (emphasis added).

3. **Irrelevance and impropriety of a "blame the victim" theory.** The United States filed a motion in limine seeking to exclude evidence or arguments intended to blame the Lenders for accepting loans from the Big Red Dealerships. The United States objects to the admission of evidence that the Lenders were somehow negligent or even that some of their employees were complicit. The "negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *United States v. Coyle*, 63 F.3d 1239, 1243-44 (3d Cir. 1995); *see also United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) (ruling that the "victim's negligence is not a defense to criminal conduct"). In other words, the "perpetrator of a fraud may not defend himself by blaming the victim for being duped." *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007) (affirming a district court's decision to exclude a banking expert's testimony that "reasonable investigation by [the lender] would have prevented the loan from closing").

Similarly, it is the Lenders, not their employees or loan officers, that are the victims of the scheme alleged here. It is irrelevant to the jury's consideration whether individual loan officers, directors, or employees knew of or were complicit in the fraudulent schemes. *See, e.g., United States v. Gallant*, 537 F.3d 1202, 1224 (10th Cir. 2008) ("It is the financial institution itself—not its directors or agents—that is the victim of the fraud the statute proscribes . . . Thus, even if [the owner of the banks] knew the true nature of the loan transactions, the institutions could nevertheless be defrauded.")

4. **Admission of Rule 1006 summary charts.** The government anticipates the introduction of several Rule 1006 charts to summarize voluminous, admissible records from entities such as (1) the Big Red Dealerships; (2) NPG; and (3) Republic Bank & Trust.

9

"Rule 1006 states that summaries are permissible when voluminous evidence 'cannot conveniently be examined in court,' and when the evidence upon which the summary is based is made available to the other parties at a 'reasonable time and place.'" *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (quoting Fed. R. Evid. 1006). The materials on which the summaries are based need not be admitted in evidence, but these underlying materials must nonetheless be admissible. *Id.*

The United States will introduce Rule 1006 summary charts for the NPG-based loan transactions, of which there are approximately 519. A chart, prepared by FBI Special Agent Jason Wildeman, consolidates information from NPG pawn slips, NPG checks from Republic Bank & Trust, Big Red Dealership files on car sales, and documents from Lenders. In total, those transactions reflect information purporting to support approximately $8,246,724.06 in financing from the Lenders. A different Rule 1006 summary chart prepared by Special Agent Wildeman will consolidate information on approximately 542 fake vehicle trade-ins from Big Red Dealership documents and Lender files, reflecting information purporting to support approximately $10,116,646.99 in financing from the Lenders. These two Rule 1006 summary charts will summarize the key information from thousands of pages of documents, including the dates of transactions, the customer names, the Lenders, the trade-in allowances or pawn amounts that were shown to Lenders as legitimate trade-ins or cash to satisfy down payment requirements, the total amount financed, and descriptions of the cars purchased, the items pawned, and the purported vehicles traded in.

Additional Rule 1006 summary charts will summarize the flow of funds from NPG to the Big Red Dealerships, via checks to customers for purported pawned items, as well as the money that returned to NPG to reimburse it for those checks. Some of the reimbursement checks came directly from Big Red Dealerships to NPG. As time went on, the Big Red Dealerships began transferring funds from batches of NPG checks to Trident, at the direction of Ms. Wells. Then Trident issued checks to NPG to reimburse it for the amounts that had been deposited at Big Red Dealerships for purported pawns, and, with only one exception, those checks were signed by Mr. Mayes, Ms. Wells, and Mr. Gooch. Rule 1006 summary charts will show this flow of funds, along with the individuals who signed the checks and authorized the transfers.

Such summary charts have been provided to defense counsel.

5. <u>Intimidation</u>. The United States anticipates testimony that Mr. Mayes employs intimidation and threats to control co-conspirators, employees, and others in his life. Such evidence is intrinsic to the conspiracy and testimony that will be offered by co-conspirators, former employees, and Lenders.

It is well-settled in this circuit that "intrinsic evidence—evidence 'inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act'"—is admissible at trial. *United States v. Hood*, No. 13-6182, 2014 U.S. App. LEXIS 24239, at *10 (10th Cir. Dec. 17, 2014) (quoting *United States v. Johnson*, 42 F.3d 1312, 1326 (10th Cir. 1994)); *accord United States v. Parker*, 553 F.3d 1309, 1315 (10th Cir. 2009) ("Because rule 404(b) only limits evidence of 'other' crimes—those extrinsic to the charged crime—evidence of acts

or events that are part of the crime itself, or evidence essential to the context of the crime, does not fall under the other crimes limitations of Rule 404(b)."); *United States v. Gorman*, 312 F.3d 1159, 1162 (10th Cir. 2002) ("[A]cts intrinsic to or intertwined with the charged acts are not Rule 404(b) acts."). Put differently, evidence "should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof of the offense charged in the indictment." *United States v. Ford*, 613 F.3d 1263, 1267 (10th Cir. 2010) (internal quotation marks omitted).

"The Rule 404(b) inquiry, however, applies only to evidence of other acts that are 'extrinsic to the one charged.'" *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009). "[A]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *Id*. "Other criminal acts are intrinsic," for example, when they are "necessary preliminaries to the crime charged," are "necessary to complete the story of the crime on trial" or "provide context relevant to the criminal charges," are "inextricably intertwined," or "arose out of the same series of transactions as the charged offense." *Id*. Evidence of past crimes, wrongs, and acts involving co-conspirators is frequently intrinsic to the charged offense, because it provides context to the relationship and is "something 'the jury necessarily ha[s] to consider' in assessing the co-conspirator's implication of the defendant, as the relationship could 'affect[] [the co-conspirator's] credibility." *See, e.g., United States v. Marfa*, 572 F. App'x 215, 225, 227 (4th Cir. 2014) (internal citations omitted).

Some witnesses, afraid of Mr. Mayes, may exhibit physical behaviors that could be consistent either with lying or with fear, and information regarding Mr. Mayes's purported

intimidation and threats will provide necessary context for the jury to assess credibility. Other witnesses may have provided incomplete or inconsistent information in prior statements and are anticipated to explain those inconsistencies based on their fear of Mr. Mayes. Witnesses are anticipated to describe Mr. Mayes as "angry," "vindictive," and "intimidating," and to explain that Mr. Mayes was known to scream, throw objects, hit objects, and break things in anger. Multiple witnesses have mentioned that Mr. Mayes has had people "followed," including undersigned counsel for the United States.

Information regarding Mr. Mayes's intimidation and threats to others should be admitted as necessary context for the jury to evaluate the credibility of current and past Big Red Dealership employees and other witnesses. Further, such information is intrinsic to the charged crimes, because it explains how Mr. Mayes was able to control his co-conspirators and employees in the commission of the charged offenses and to silence, resolve, and cover-up claims by those who raised concerns.

6. <u>Intent to defraud</u>. The indictment includes several counts in which an "intent to defraud" is required. A defendant acts with the requisite "intent to defraud" if the defendant acted knowingly and with the specific intent or purpose to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to the defendant. *United States v. Flanders*, 491 F.3d 1197, 1208-210 (10th Cir. 2007). But the "defendant need not have intended to harm the bank or to personally profit." *United States v. Grissom*, 44 F.3d 1507, 1511 (10th Cir. 1995).

Likewise, the bank does not have to experience a monetary loss; rather, the government must prove that defendant knowingly exposed the institution to potential risk

with misrepresentations or omissions.  *United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000) ("the government does not have to prove the bank suffered any monetary loss, only that the bank was put at potential risk by the scheme to defraud . . . the government need not prove that a defendant put a bank 'at risk' to sustain a conviction under section 1344(2)."); *United States v. Bowling*, 619 F.3d 1175 (10th Cir. 2010) ("The government does not have to prove the financial institution suffered a monetary loss, but only that the scheme to defraud put the institution at potential risk.").

An honest belief that the bank would ultimately cover that risk or profit from that risk is not an excuse for false statements or misrepresentations.  *United States v. Stathakis*, 320 F. App'x 74, 76 (2d Cir. 2009) (the government must prove the defendant "had the intent to expose the bank to an actual or potential loss," which is "not inconsistent with an honest belief that no harm would come to the bank."; "an honest belief" that no harm will come to the bank does "not excuse fraudulent actions or false representations."); *U.S. v. Ratchford*, 942 F.2d 702 (1991) (combined bank accounts later contained sufficient funds to cover checks underlying 3 counts of bank fraud, but relevant time for intent is date checks were written, when defendant knew accounts had insufficient funds).  Accordingly, if Defendants attempt to argue that they held an honest belief that these loans would benefit the Lenders, the United States will object to such evidence and argument as irrelevant.

7.  <u>No forfeiture issues for the jury to decide</u>.  The Indictment includes forfeiture allegations and seeks a money judgment representing the amount of proceeds obtained as a result of the offenses.  (Doc. 1, at 29-30.)  If a jury convicts Defendants, Federal Rule of Criminal Procedure 32.2(b)(1) calls for the Court—not the jury—to determine the amount

of money judgment they must pay. "If the government does not seek specific property, but rather a personal money judgment, the court itself determines the amount of money that the defendant will be ordered to pay." *United States v. Roberts*, 631 F. Supp. 2d 223, 225-26 (E.D.N.Y. 2009) (internal quotation marks omitted). "The defendant is not entitled to have the jury decide the amount of forfeiture." *Id.*

## CONCLUSION

The United States will be prepared to provide additional research or briefing as the Court requires.

Respectfully submitted,

ROBERT J. TROESTER
Acting United States Attorney

*s/ K. McKenzie Anderson*
K. McKenzie Anderson, OBA #30471
Thomas Snyder, OBA #31428
Assistant United States Attorneys
210 West Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 - Telephone
(405) 553-8888 – Facsimile
McKenzie.Anderson@usdoj.gov
Thomas.Snyder@usdoj.gov
*Counsel for Plaintiff United States*

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 18, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

*Counsel for Bobby Chris Mayes:*
Vicki Zemp Behenna
Rachel N. Jordan
Brett Behenna
William H. Bock
Michelle L. Greene

*Counsel for Charles Gooch:*
Joseph G. Shannonhouse

*Counsel for Courtney Wells:*
S. Thomas Adler, II
Dana Good
Robert D. Gifford

                                              *s/ K. McKenzie Anderson*
                                              Assistant U.S. Attorney