# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-20-240-F |
| | ) | |
| BOBBY CHRIS MAYES, | ) | |
| CHARLES GOOCH, and | ) | |
| COURTNEY WELLS, | ) | |
| | ) | |
| Defendants. | ) | |

## **DEFENDANTS' JOINT MOTION FOR NEW TRIAL**

Vicki Zemp Behenna, OBA #10734
Rachel N. Jordan, OBA #32704
Wm. Brett Behenna, OBA #30485
BEHENNA GOERKE KRAHL & MEYER
210 Park Avenue, Suite 3030
Oklahoma City, OK 73102
Telephone: 405-232-3800
vzb@lawfirmokc.com
rjordan@lawfirmokc.com
bb@lawfirmokc.com
Attorneys for Mr. Mayes

William H. Bock, OBA # 13888
WILLIAM H. BOCK, INC.
6402 N. Santa Fe Avenue, Suite
Oklahoma City, OK 73116
Telephone:  (405) 848-5400
billybock@wbocklaw.com
Attorneys for Mr. Mayes

Joseph G. Shannonhouse, IV, OBA # 8117
SHANNONHOUSE LAW OFFICES, P.L.L.C.
500 North Walker, Suite C-100
Oklahoma City, OK 73102
Telephone: (405) 415-1700
js@shannonhouselaw.com
Attorney for Mr. Gooch

Robert D. Gifford, OBA #17034
GIFFORD LAW, P.L.L.C.
P.O. Box 2682
Oklahoma City, OK 73101-2682
Telephone: (405) 778-4647
Robert.gifford@giffordlawyer.com
And
S. Thomas Adler, II  OBA #19997
Atkins Markoff Adler
9211 Lake Hefner Pkwy #104
Oklahoma City, OK 73120
Telephone: (405) 607-8757
tadler@amalaw.com
Attorney for Ms. Wells

# **TABLE OF CONTENTS**

I.   PROCEDURAL BACKGROUND..............................................................................1

II.  ARGUMENT AND AUTHORITY ..........................................................................1

III. THE GOVERNMENT'S MISCONDUCT WAS PERVASIVE BOTH BEFORE
     AND DURING TRIAL..............................................................................................2

IV. THE CUMULATIVE EFFECT OF THE GOVERNMENT'S MISCONDUCT AT
     TRIAL RENDERED THE PROCEEDINGS CONSTITUTIONALLY UNFAIR ...5

    A.   The Government's Cross-Examination of Mr. Mayes was Riddled
        with Unfair Prejudice ......................................................................................6

    B.   The Government Knowingly Elicited and Failed to Correct False
        Testimony from Agent Jason Wildeman Regarding Signatures
        on Checks to Norman Pawn & Gun....................................................................13

    C.   The Government Knowingly Elicited and Failed to Correct False
        Testimony Regarding Ms. Mullins' Statements to the FBI ...............................18

    D.   The Government Failed to Disclose that Donna Mullins,
        a Key Witness, Lied to the FBI.........................................................................20

    E.   The Government Baselessly Implied that Defendants Did Not Turn
        Over All Documents Responsive to the Subpoenas ..........................................21

    F.   The Government Baselessly and Unfairly Implied During
        Closing Arguments that Additional Fraud Existed............................................24

    G.   The Government Elicited False Testimony at Grand Jury..................................24

    H.   The Cumulative Effect of the Errors, When Weighed Against the
        Strength of the Evidence, Rendered the Trial Fundamentally Unfair ...............25

# TABLE OF AUTHORITIES

## CASES

*Berger v. United States*,
    295 U.S. 78 (1935) ......................................................................... 10, 25

*Darden v. Wainwright*,
    477 U.S. 168 (1986) ............................................................................ 10

*Dow v. Virga*,
    729 F.3d 1041 (9th Cir. 2013) ............................................................. 12

*Evans v. Virginia*,
    471 U.S. 1025 (1985) ........................................................................... 12

*Giglio v. United States*
    405 U.S. 150 (1972) ............................................................................. 20

*Johnson v. Mullin*,
    505 F.3d 1128 (10th Cir. 2007) ........................................................... 12

*Le v. Mullin*,
    311 F.3d 1002 (10th Cir. 2002) .............................................................. 2

*LeBere v. Trani*,
    746 Fed.Appx. 727 (10th Cir. 2018) .................................................... 12

*Napue v. Illinois*
    360 U.S. 264 (1959) ............................................... 11, 12, 13, 16, 18, 19

*United States v. Agurs*,
    427 U.S. 97 (1976) ............................................................................... 12

*United States v. Bagley*,
    473 U.S. 667 (1985) ............................................................................. 12

*United States v. Barrett*,
    496 F.3d 1079 (10th Cir. 2007) .............................................................. 2

*United States v. Berger*,
    295 U.S. 78 (1935) ................................................................................. 2

*United States v. Christy,*
    916 F.3d 814 (10th Cir. 2019) ................................................................ 1

*United States v. Freeman,*
    650 F.3d 673 (7th Cir. 2011) ................................................................ 17

*United States v. Johnson,*
    968 F.2d 768 (8th Cir. 1992) ................................................................ 10

*United States v. Katsougrakis,*
    715 F.2d 769 (2d Cir. 1983) .................................................................. 9

*United States v. Lonedog,*
    929 F.2d 568 (10th Cir. 1991) ................................................................ 2

*United States v. Thomas,*
    2016 WL 9819560 (D.N.M. Aug. 5, 2016) .............................................. 2

*United States v. Toles*,
    297 F.3d 959 (10th Cir. 2002) ................................................................ 2

*United States v. Wall,*
    389 F.3d 457 (5th Cir. 2004) ................................................................. 2

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) ................................................................ 17

*United States v. Young,*
    20 F.3d 758 (7th Cir. 1994) ................................................................. 17

## STATUTES

18 U.S.C. § 513(a) ........................................................................................ 1

18 U.S.C. § 1343 ........................................................................................... 1

18 U.S.C. § 1028A ........................................................................................ 1

18 U.S.C. § 1349 ........................................................................................... 1

# MISCELLANEOUS

Federal Rules of Criminal Procedure 33 .............................................................. 1

<u>**DEFENDANTS' JOINT MOTION FOR NEW TRIAL**</u>

The conviction in this case is irreparably tainted by repeated instances of prosecutorial misconduct, the cumulative effect of which rendered the trial constitutionally unfair. Accordingly, Defendants, Bobby Chris Mayes ("Mr. Mayes"), Charles Gooch ("Mr. Gooch"), and Courtney Wells ("Ms. Wells") (collectively referred to as "Defendants"), respectfully move the Court to grant a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. In support of this motion, Defendants state as follows:

## I.       Procedural Background

On September 16, 2020, Mr. Mayes, Mr. Gooch, and Ms. Wells were charged in a multi-count Indictment with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 (Count 1), twelve counts of wire fraud, in violation of 18 U.S.C. § 1349 (Counts 2-13), six counts of uttering forged securities, in violation of 18 U.S.C. § 513(a) (Counts 14-19), and six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 20-25). On Friday, November 19, 2021, after a nearly three-week trial, the jury convicted Mr. Mayes and Mr. Gooch on all counts, and Ms. Wells on 19 counts.

## II.      Argument and Authority

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." When reviewing a defendant's motion for new trial based on prosecutorial misconduct, the Tenth Circuit engages in a two-step inquiry: the Court must first determine if the conduct was improper and, if so, it must then evaluate the likely effect of the conduct on the jury's verdict. *United States v. Christy*, 916 F.3d 814, 824 (10th Cir.

2019). Factors to be considered in determining whether the conduct warrants reversal include: 1) magnitude of the prejudicial effect of the errors; 2) the efficacy of any cautionary instructions; and 3) the strength of the evidence of the defendant's guilt. *United States v. Thomas*, 2016 WL 9819560 at *12 (D.N.M. Aug. 5, 2016) (citing *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). *See also United States v. Lonedog*, 929 F.2d 568, 572 (10th Cir. 1991).

The Court must also consider the cumulative effect of any errors to determine whether they "add up to make a trial fundamentally unfair in the aggregate." *Le v. Mullin*, 311 F.3d 1002, 1022-23 (10th Cir. 2002). *See also United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007) (new trial is warranted when a defendant's substantial rights were affected by the cumulative effect of the otherwise harmless errors); *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002) (noting the cumulative-error analysis "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless").

The Supreme Court has noted that, while a prosecutor may strike hard blows, "he is not at liberty to strike foul ones." *United States v. Berger*, 295 U.S. 78, 88 (1935). The government delivered a series of foul blows in this case that, when added together and viewed in the context of the trial as a whole, rendered it fundamentally unfair.

## III.    The Government's Misconduct Was Pervasive Both Before and During Trial

In evaluating the government's conduct at trial, it is important for the Court to first understand the pervasive pattern of misconduct leading up to trial. From the outset, the government has approached this case with a "win at all costs" attitude.

First, the government omitted material and exculpatory information from written interview reports, which defense counsel only realized after listening to the audio recordings of certain interviews and comparing them to the corresponding 302s.

For example, the government interviewed Mr. Mayes' uncle, Roger Mayes, on November 12, 2020. The audio recording of that interview reveals that Roger relayed a number of different anecdotes about the government's main witness, Andy Elliott, that called directly into question Mr. Elliott's credibility. Roger informed the government that he caught Mr. Elliott 1) attempting to reclassify a salesman's employment status so the employee could refinance his home mortgage, and 2) stealing "40-something thousand dollars' worth" of tires and "telling the parts manager not to bill sales … because it affected his commission." Neither of these anecdotes appeared in the seven-page 302 that was produced. *See* Roger Mayes Interview Reports, attached hereto as Exhibit "1." Nor did the FBI bother to include the story Roger told them about Mr. Mayes being "mad at [Chuck and Courtney] about something" in September, 2017, which resulted in Mr. Mayes telling Chuck and Courtney at that time that they were not to sign any more checks. This story corroborates Defendants' assertion that Mr. Mayes found out in August, 2017 that the pawn shop values had gotten out of control, yet the 302 makes no mention of it. *Id*.

In that same interview, Roger described Mr. Elliott as "the big ringleader in this whole deal," "a troublemaker," "the ultimate car salesman," "he can sell an eskimo a refrigerator," and said that "[o]n the expense end, and just being around, there is nobody any 'slipperier' than Andy Elliot." Roger told the government he did not think Mr. Mayes told Mr. Gooch how to run the pawn shop, described the pawn shop as a "fiasco of people

3

who weren't paying attention," and said that Mr. Mayes "went through a really nasty divorce and probably took his eye off the ball during that time." Roger said that Mr. Gooch was "lazy," was "not a good businessman," and that "Andy seems to be at the center of all these deals." The 302 merely states, "Roger believes Elliott was the ring leader." *Id.*

Likewise, the government interviewed Josh Vanover on April 25, 2019. Mr. Vanover told the government that Mr. Gooch informed him items sold to the pawn shop must be worth what he was paying for them. Mr. Vanover said he could not recall ever <u>not</u> getting the items that customers provided. He said it was very common for Mr. Gooch to call him and have him go get an item, and that if he did not get the item the deal would not go through. When asked if Mr. Mayes would have known about salesmen "coaching" customers, Mr. Vanover said that Mr. Mayes is an owner that is not part of everyday deals; you don't talk to him about everyday deals; he's the guy that chews you out once a month for not doing a good job; he doesn't talk to you about day-to-day business. Mr. Vanover said Mr. Mayes relies on his managers to handle things. When asked if Mr. Mayes instructed sales staff to use in-and-outs, Mr. Vanover said, "No, it was a bank that told Bentley [another Big Red employee] about it." Lastly, Mr. Vanover estimated pawn shop transactions were 1-2% of total sales and said that his sales did <u>not</u> drastically decline when the pawn shop was terminated. None of these exculpatory statements appear in the 302 that was produced. *See* Josh Vanover Interview Report, attached hereto as Exhibit "2."

Additionally, the government attempted to prejudice Mr. Mayes in the eyes of the Court by making baseless and inflammatory allegations about him in pre-trial briefing. On October 18, 2021, Assistant United States Attorney McKenzie Anderson ("Ms. Anderson")

filed a trial brief in which she claimed for the first time that Mr. Mayes had her followed. Doc. 112, p. 13. On October 29, 2021, the government represented that evidence of intimidation and threats was "pervasive" throughout witness interviews. The Court then ordered the government to file a memorandum regarding the admissibility of evidence of intimidation and threats, which was to be "date specific, person specific, and substance specific." Doc. 132. On November 1, 2021, Ms. Anderson filed the memorandum, in which she claimed for the first time that the FBI was currently investigating Defendants for witness harassment and tampering[1], and that Mr. Mayes once hid in a man's attic for two days before beating him up. Ms. Anderson also implied that Mr. Mayes was involved in the disappearance of an alleged victim in another case, as well as the murder of a prominent Dallas attorney who was burned alive in his garage. Finally, Ms. Anderson claimed that current and former employees have mentioned "Mr. Mayes's attack dogs, which attacked people, and were always with him at Norman Mitsubishi." None of these allegations are reflected in any 302 produced by the government, or supported by a good faith basis.

It is against this backdrop of materially incomplete 302s and inflammatory accusations that this Court should assess the fairness of Defendants' trial.

## IV.    The Cumulative Effect of the Government's Misconduct at Trial Rendered the Proceedings Constitutionally Unfair

The government made a series of errors that, when added together and viewed in the context of the trial as a whole, cannot be regarded as harmless. These errors include

---

[1] Defendants are not aware of any current investigation into witness harassment and tampering, and it is unclear whether any such investigation was actually being conducted at the time of this representation.

highly prejudicial accusations made without a good faith basis, knowingly eliciting and failing to correct false testimony from a number of witnesses, and failing to disclose information that a material government witness lied to the FBI.

**A. The Government's Cross-Examination of Mr. Mayes was Riddled with Unfair Prejudice**

Ms. Anderson's cross-examination of Mr. Mayes began with a series of wildly inappropriate accusations which were not relevant to any of the charges in the Indictment and were made for the sole purpose of prejudicing Mr. Mayes in the eyes of the jury. First, Ms. Anderson began her cross-examination of Mr. Mayes by asking him about an illegitimate child born in 1999:

> Q:   Mr. Mayes, I'd like to start where your direct examination started, okay? You said that you have four children; is that correct?
> A:   Yes.
> Q:   You have another daughter, don't you?
> A:   I do, but she's not part of our family.
> Q:   So you didn't mention her?
> A:   Well, we've never ran tests to see that she was my daughter.
> Q:   When was she born?
> A:   She is 21.
> Q:   Do you know what her birth date was?
> A:   I don't know. I wasn't a part of that.
> Q:   December 23, 1999, sound about right?
> A:   Could, yes.
> Q:   And isn't it true that instead of paying child support to her mother, you paid her mom as an employee of Big Red Sports when she never worked there?
>
> MS. BEHENNA:   Objection; relevancy, Your Honor.
> THE COURT:       Sustained.

Tr. 2286-87. Ms. Anderson then moved into a line of questioning regarding the medical marijuana dispensary:

Q:      We've seen a lot of witnesses testify that they work at Native Harvest
        Dispensary; is that correct?

A:      Yes, ma'am.

Q:      Where is Native Harvest Dispensary located?

MS. BEHENNA:      Objection; relevancy, Your Honor.

THE COURT:        I'll hear a little more about it, so that will be overruled
                  at this point.

A:      There's more than one location, ma'am.

Q:      Is there one in the building you own in which Norman Mitsubishi was
        located?

A:      Well, I don't own that building. But, yes, there's one located there.

                                    ***

Q:      You help [your father] run that company?

A:      Yes, I do. So does my sister, who is sitting right there.

Q:      And that company is – has both dispensary locations and a grow
        location for marijuana; is that correct?

MS. BEHENNA:      Relevancy, Your Honor.

THE COURT:        Sustained.

Tr. 2287-89. Despite the Court sustaining the objection for relevancy, Ms. Anderson's next

"question" was lodged for the sole purpose of driving her previous point home:

Q:      Mr. Mayes, the sale of marijuana is still a federal crime; correct?

MS. BEHENNA:      Objection.

THE COURT:        You're directed to move on to some other subject.

Tr. 2289. At that point, counsel for Defendants moved for a mistrial based on Ms.

Anderson's improper questioning. The Court took the motion under advisement with a

warning to Ms. Anderson that it was "time for [her] to zero in on what this lawsuit is really

about." Tr. 2290-91. Instead of heeding the Court's warning, however, Ms. Anderson

accused Mr. Mayes for the first time of hammering vehicles to obtain insurance proceeds:

Q:     Yes. And you're aware that in 2013 your employees, after that tornado, hammered a bunch of vehicles?

A:     I'm not aware of that at all.

MS. BEHENNA:     Objection, Your Honor.
THE COURT:     I'll hear the objection.
MS. BEHENNA:     Your Honor, can I have a bench conference again?
THE COURT:     You may.

Tr. 2293. At the bench conference, Ms. Behenna renewed the prior motion for mistrial, pointing out that there was "no basis in fact" for Ms. Anderson to ask that question, which was asked "specifically to dirty up Mr. Mayes." Tr. 2294. The Court then asked Ms. Anderson what she was prepared to prove on her line of questioning. *Id*. Ms. Anderson represented to the Court that she "ha[d] reason to believe, based on interviews and information provided by witnesses, that Mr. Mayes knew about intentional damage to vehicles to increase proceeds from insurance." *Id*. Likewise, at the hearing on Defendants' motion, Ms. Anderson claimed again that she was "eliciting information on which [she] had a good-faith basis to believe and **had a witness, Andy Elliott, who could have spoken to the hammering of vehicles and Mr. Mayes' awareness of that.**" Tr. 2458.

THE COURT:     Are you representing, as an officer of the court, that Mr. Mayes was a percipient witness to the hammering and Mr. Mayes' – Chris Mayes' knowledge of the hammering? **Are you representing that to me, as an officer of the court, that you had Mr. Elliott as a percipient witness to those two key facts?**

MS. ANDERSON:     **Yes, Your Honor.** Mr. Elliott said that Mr. Mayes was involved in the hammering, which was called "the treatment" of vehicles in 2013 for insurance claims. And although Ms. Edwards said she didn't know about it. We had another witness who said that he knew about it and he knew that Mr. Mayes was involved.

8

The Court ultimately concluded that, "given the suggestion that [Mr. Elliott] may have been a percipient witness," the error was "not as crystal and clear-cut" and, accordingly, denied Defendants' motion for mistrial. Tr. 2464-65. Contrary to Ms. Anderson's representations, however, the hypothetical proffer letter from Mr. Elliott's attorney does not indicate that Mr. Elliott was a percipient witness at all. It identifies only four people as being present: Mr. Mayes, Mr. Gooch, Jared Cunningham, and Jacob Albertson. Thus, according to the proffer letter, the only "percipient witnesses" who could have actually testified in support of Ms. Anderson's claim were Mr. Cunningham or Mr. Albertson. Mr. Cunningham, who was Mr. Mayes' legal counsel at the time, was not interviewed by the government, and Mr. Albertson's 302 makes no mention of this topic.

Defendants are not aware of any other basis Ms. Anderson could have had to ask such a loaded question. Mr. Elliott was not asked about the alleged insurance fraud at the grand jury and there is no record of him being asked about it in any interview. The only other evidence produced in discovery related to this topic is a 302 of Ms. Edwards, dated February 6, 2020, who said she was "not aware of any vehicles intentionally damaged for insurance proceeds."

Ms. Anderson's questioning as to the hammering of vehicles was clearly improper. "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts." *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983). When confronted by the Court with a demand for an offer of proof on her "horrifically loaded" question (Tr.

2464), the explanation offered by Ms. Anderson fell short; Mr. Elliott was neither a percipient witness to the alleged hammering nor available to take the stand. He was 1,000 miles away at the time of Mr. Mayes' cross-examination and, as the Court noted, Ms. Anderson's assertion on the second-to-last day of trial that she was prepared to recall him was wholly unpersuasive.[2] Tr. 2464-65.

Having established the government's conduct was improper, the Court must determine if it warrants reversal. While courts must consider the cumulative effect of errors, it is also true that "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992). The key question ultimately is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168 (1986).

Ms. Anderson's cross-examination of Mr. Mayes was, standing alone, so destructive of Defendants' right to a fair trial that reversal is mandated. As the Supreme Court noted in *Berger v. United States*, the average jury has confidence that a prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." 295 U.S. 78, 88 (1935). Accordingly, improper suggestions and insinuations from an Assistant United States Attorney "are apt to carry much weight against the accused when they should properly carry none." *Id*. Consequently, the *highly* prejudicial suggestion by Ms. Anderson

---

[2] While Ms. Anderson alluded to another witness who allegedly provided information about this topic, she did not identify that witness or offer to call him/her to the stand.

that Mr. Mayes was involved in hammering vehicles for insurance proceeds—for which she had no good faith basis—was likely to impact the jury.

Additionally, Ms. Anderson's repeated references to marijuana throughout the trial are even more egregious in light of the fact that the government was aware that Mr. Mayes did not own the dispensary, but intentionally elicited testimony that he did. At the motion for mistrial hearing, the Court noted that Mr. Mayes' association with a dispensary "came in in kind of a soft way when Theresa Moody was on the stand." Tr. 2463. More specifically, Ms. Moody testified on cross-examination that her husband "does jobs for Big Red and for the dispensary that he owns." Tr. 1218. On redirect, Ms. Anderson asked:

> Q:    Ms. Moody, just to clarify, you said that your husband does jobs or did jobs for the dispensary that someone owns. Who owns the dispensary?
> A:    I believe Chris Mayes does.
> Q:    And what does the dispensary dispense?
> A:    It's CBD. Medical marijuana.

Tr. 1238-39. What the Court did not know, and Ms. Anderson failed to disclose, was that she *knew* Mr. Mayes did not own Native Harvest. The FBI contacted Roger Mayes, Mr. Mayes' uncle, sometime in or around October, 2021 and specifically asked him about the ownership of the dispensary. *See* Affidavit of Roger Mayes, attached hereto as Exhibit "3." Roger told the FBI that it was owned by Jim Mayes.[3] Ms. Anderson was obligated to correct Ms. Moody's false statement; instead, she *emphasized* it.

In *Napue v. Illinois*, the prosecutor elicited and did not correct what he knew to be false information. 360 U.S. 264 (1959). The Supreme Court explained that "a conviction

---

[3] The government did not produce a 302 related to this phone call.

obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id*. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id*. "Since *Napue*, the Supreme Court 'has adhered to the principle that a conviction obtained by the knowing use of false evidence is fundamentally unfair.'" *Johnson v. Mullin*, 505 F.3d 1128, 1154 (10th Cir. 2007) (quoting *Evans v. Virginia*, 471 U.S. 1025, 1027-28 (1985)).

As a general matter, to reverse a conviction for the use of false testimony, a defendant must show the prosecutor knowingly used false testimony or failed to correct it, and that the falsehood was material. False testimony is material under *Napue* "unless failure to disclose it would be harmless beyond a reasonable doubt.'" *LeBere v. Trani*, 746 Fed.Appx. 727, n. 1 (10th Cir. 2018) (quoting *United States v. Bagley*, 473 U.S. 667 (1985)). Courts have noted this is a far less demanding standard than ordinary harmless error review because it requires only a showing that the error *could* have affected the judgment of the jury, as opposed to a showing that it *would* have. *See Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (citing *United States v. Agurs*, 427 U.S. 97 (1976)).

Having established that Ms. Anderson failed to correct and then knowingly elicited false testimony, the Court must determine if the falsehood was material. The only purpose of having Ms. Moody repeat her claim that Mr. Mayes owned Native Harvest was to prejudice him in the eyes of the jury, particularly when viewed in conjunction with Ms. Anderson's subsequent cross-examination of Mr. Mayes in which she questioned him about the federal implications of selling marijuana. The government's use of false evidence

to prejudice Mr. Mayes on an issue wholly unrelated to the Indictment *could* have affected the judgment of the jury, which is all Defendants are required to establish under *Napue*.

### B. The Government Knowingly Elicited and Failed to Correct False Testimony from Agent Jason Wildeman Regarding Signatures on Checks to Norman Pawn & Gun

A central component of the defense theory regarding Norman Pawn & Gun was that the pawn shop originated not as a criminal conspiracy to defraud lenders, but as a legitimate way for customers to obtain money for a down payment. In support of that theory, Defendants presented evidence that, while Mr. Mayes was aware of the pawn shop's existence, he was not aware until August, 2017 that items were being overvalued. Mr. Gooch, for his part, was simply a bad businessman and, without Mr. Mayes there to take an active role in the management of the pawn shop, things got out of hand.

In an effort to demonstrate that Mr. Mayes knew all along that the pawn shop was not operating as a legitimate business, Ms. Anderson elicited testimony from Agent Jason Wildeman that the signature on a number of checks written from the Big Red Dealerships to Norman Pawn & Gun, when compared to the signature cards on Government's Exhibit 17, attached hereto as Exhibit "4," appeared to be the signature of Mr. Mayes. The problem with Agent Wildeman's testimony is that it is blatantly false.

Starting with the check on the bottom left of Government's Exhibit 16.2, attached hereto as Exhibit "5," Agent Wildeman testified as follows:

Q:    And do you recognize the signatures on those checks?
A:    Yes, I do.

Q:     Whose signature appears as at least one of the signatures?[4]
A:     The top signature appears to be Courtney Wells and **the signature below it appears to be Chris Mayes.**
Q:     Okay. And this one?
A:     The same. The top signature appears to be Courtney Wells and **the bottom signature appears to be Chris Mayes.**
Q:     Okay. And let's see. On this next page, what about these bottom checks?
A:     Yes. So the deposit slip shows the totals for the checks listed below both from Big Red Sports & Imports to Norman Pawn & Gun.
Q:     Okay. And who is signing those checks?
A:     Similar to the previous two checks, the top signature appears to be Courtney Wells. **The bottom signatures appear to be Chris Mayes.**
Q:     Okay. So at the beginning of Norman Pawn & Gun, how is Norman Pawn & Gun getting money to write the checks it was issuing to customers?
A:     It's receiving its funds either in the form of cash, a personal check from Bobby Chris Mayes, or checks written from the dealerships themselves back to Norman Pawn & Gun.
Q:     Okay. And so on 16.4, are these additional dealership checks going to Norman Pawn & Gun?
A:     Yes, they are.
Q:     Same on page 16.5?
A:     Yes, that's correct.
Q:     Dealership checks. And can you tell who signed this one?
A:     That top signature appears to be consistent with Courtney Wells' signature, and **the bottom signature below it appears to be consistent with Bobby Chris Mayes.**
Q:     And then let's see. What about the top signature on this Big Red check towards the bottom?
A:     This particular check, the top signature is Charles Gooch and **the bottom signature appears to be consistent with Bobby Chris Mayes.**

Tr. 656-657. On cross-examination, Ms. Behenna confronted Agent Wildeman with the

signatures side-by-side:

Q:     You believe that the signature that I'm pointing to on the bottom on Government's Exhibit Number 17 appears to be the same signature – on the second signature on Government's Exhibit Number 16.2?
A:     That was –
Q:     Is that what you're testifying now?

---

[4] It appears Ms. Anderson, based on the phrasing of this question, was specifically attempting to point out that "at least one of the signatures" belonged to Mr. Mayes.

A:    That was the opinion that I formed, yes. However, everybody can see it side by side here and form their own opinion.

Q:    And can see that it's not anywhere near the same signature, right?

A:    **Well, I'm not prepared to agree with that.**

\*\*\*

Q:    And you're just guessing, are you not, that Chris signed these checks?

A:    No, ma'am. That was not a guess.

\*\*\*

Q:    Are you telling this jury that that's Chris Mayes' signature?

A:    Are you looking at the check at the top?

Q:    At the very top.

A:    I am saying that that was consistent with some of the other signatures that I saw that were signed by Bobby Chris Mayes.

Ms. Behenna informed Agent Wildeman that the signatures he was attributing to Mr. Mayes were actually signed by another government witness, Faith Edwards (which Ms. Edwards later confirmed). Tr. 697. Notably, the Court recessed early that day due to a medical emergency involving one of the jurors' wives, giving the government ample opportunity to inquire of Ms. Edwards whether the signatures were in fact hers before putting Agent Wildeman back on the stand, which it did not do.

On redirect, Ms. Anderson referred to the chart Agent Wildeman prepared in advance of trial, which was included as Government's Exhibit 5, and pointed out that he had not actually identified Mr. Mayes as a signatory on any of the checks referenced above, seeming to imply that he may have misspoken about those checks the day before. Tr. 816-817. But rather than <u>correct</u> Agent Wildeman's false testimony, which she was obligated to do, Ms. Anderson simply said, "the jury can make their own decision about signatures based on the signature cards on each of those checks[.]" Tr. 818. On recross, Agent

15

Wildeman again testified that the signatures at issue were consistent with the signature of Mr. Mayes. Tr. 821.

The government's misconduct here is threefold. First, the government elicited false testimony that Mr. Mayes' signature appeared on certain checks to Norman Pawn & Gun despite the obvious differences in the signatures, and the fact that Agent Wildeman had not identified Mr. Mayes as a signatory on those checks in the chart he prepared for trial, attached hereto as Exhibit "6." The government knew or, at a minimum, should have known, that Agent Wildeman's testimony was inaccurate but repeatedly elicited testimony that the signatures matched. Likewise, the government allowed Agent Wildeman to *continue* testifying falsely on recross. The government's blatant and willful disregard for the accuracy of Agent Wildeman's testimony violates the basic tenet of *Napue*.

Just as improper suggestions from a prosecutor "are apt to carry much weight against the accused when they should properly carry none," so too are improper suggestions from an FBI agent. Consequently, an FBI agent's testimony that there are similarities in two signatures is likely to carry weight with the jury, even when no such similarities exist. And while defense counsel did cross-examine Agent Wildeman about these issues, cross-examination is not an adequate substitute for the government's obligation to correct false testimony; a prosecutor's assertion that a government witness testified incorrectly would clearly carry more weight with the jury than defense counsel's assertion of the same, particularly when the witness on cross-examination won't concede any errors in his analysis.

16

Lastly, Ms. Behenna clearly indicated that the signatures at issue belonged to Ms. Edwards, not Mr. Mayes. The government, who has an unequivocal duty to assure the accuracy of its representations, had ample opportunity to contact Ms. Edwards that afternoon or evening to ask if the signatures were hers. *See United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011) ("When the government learns that part of its case may be inaccurate, it must investigate. It cannot simply ignore evidence that its witness is lying."); *United States v. Young*, 20 F.3d 758 (7th Cir. 1994) (noting "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance"); *United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) ("We fear that given the importance of the witness's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious – that is, that the witness was not telling the truth."). The government abdicated its responsibility when it chose not to contact Ms. Edwards, despite having both reason and opportunity to do so.

Having established that the prosecutor knowingly elicited and failed to correct false testimony, the Court must determine whether the falsehood was material. As the Court itself noted, "there was nothing intrinsically fraudulent about an affiliated pawn shop – per se – engaging in legitimate pawn transactions resulting in a real down payment being paid to and retained by the dealer with accurate representations to the lender." Tr. 1763. Therefore, in order to establish the conspiracy charged in Count 1, the government needed to establish that Defendants knew the pawn shop was not operating as a legitimate business.

With the exception of Mr. Elliott's testimony, which was replete with credibility issues, Agent Wildeman's testimony was the only evidence from which the jury could reasonably infer that Mr. Mayes possessed the requisite knowledge to find him guilty of a

conspiracy. The government later exploited Agent Wildeman's false testimony during closing argument to make that very point, claiming that Defendants' signature on the checks to Norman Pawn & Gun was evidence of their knowledge that Norman Pawn & Gun was not "open for business." *See* Tr. 2550 ("You know that Chris Mayes, Courtney Wells, and Charles Gooch knew that Norman Pawn & Gun was not open for business because they signed the checks back to Norman Pawn & Gun."). The government's use of false evidence to establish an essential element of the conspiracy very likely *could* have affected the judgment of the jury, which is all *Napue* requires, and reversal is warranted.

### C. The Government Knowingly Elicited and Failed to Correct False Testimony Regarding Ms. Mullins' Statements to the FBI

On direct examination of Agent Justin Lowrance, Assistant United States Attorney Tom Snyder ("Mr. Snyder") elicited testimony that Donna Mullins, the loan officer that Mr. Elliott paid money to, indicated to him that Mr. Mayes was involved in paying her:

> Q:   Who were you going to see?
> A:   Chris Mayes.
> Q:   **And why Mr. Mayes?**
> A:   I don't recall exactly, but I believe at that point in the investigation, **Donna kind of alluded that Chris Mayes may have been the one that was orchestrating all of this.**

Tr. 123. On cross-examination, Mr. Behenna noted that Agent Lowrance had multiple interactions with Ms. Mullins, yet none of the resulting 302s mention that Mr. Mayes was in any way involved. Mr. Behenna provided copies of those 302s to Agent Lowrance on the stand and asked him to see if they mention anything about Mr. Mayes:

> Q:   And I want you to look through them and see, in any of your reports, do you see anything about Donna mentioning anything about Chris Mullins – or Chris Mayes?

18

***

A:     No, I don't think she ever alleged that Chris was the one that gave her money.

Q:     Right. Or was involved in [it]?

A:     Yeah, I don't think so.

Q:     But I'm making this point for a reason –

A:     Sure.

Q:     -- because yesterday I think the jury heard you say or I heard you say, because I wrote it down –

A:     Uh-huh.

Q:     -- that Donna alluded Chris Mayes being involved.

A:     I did say that. I remember saying that.

Q:     That's not in any 302 that you've come up with?

A:     Yeah, this happened a long time ago. If I said that and that's not true, I apologize.

Tr. 179-180. The Government was in possession of the 302s and, consequently, knew that Ms. Mullins never actually suggested Mr. Mayes was involved, but elicited the testimony anyway. Having established that the prosecutor knowingly elicited and failed to correct false testimony, the Court must determine if the falsehood was material. With the exception of Mr. Elliott's testimony, there was no other evidence from which the jury could reasonably infer that anyone but Mr. Elliott was involved in "bribing" Ms. Mullins, which was an act in furtherance of the alleged conspiracy. The government's use of false evidence to establish Mr. Mayes' involvement in act in furtherance of the conspiracy *could* have affected the judgment of the jury, which is all *Napue* requires, and reversal is warranted.

### D.  The Government Failed to Disclose that a Key Witness, Lied to the FBI

During the course of Ms. Mullins' testimony, it became apparent that the government at some point learned she had lied to them about being in an intimate relationship with Mr. Mayes, but had not disclosed that fact to the defense. Mr. Snyder—

clearly anticipating what the answer was going to be—asked Ms. Mullins on redirect about

her relationship with Mr. Mayes:

> Q:   Did you ever have a physical relationship with Mr. Elliott?
> A:   No, I did not.
> Q:   Do you have a physical relationship with someone else at the dealership?
> A:   Yes.
> Q:   Who was that?
> A:   Chris Mayes.

Tr. 114. Ms. Mullins' testimony at trial was contrary to her previous statements in which

she denied having an intimate relationship with Mr. Mayes. On recross, Ms. Mullins

admitted to lying to the FBI but revealed that the government was *aware* she had lied.

> Q:   Ms. Mullins, you lied to the FBI about whether or not you had a personal relationship with Mr. Mayes, correct?
> A:   I did at first.
> Q:   Okay. When did you correct that lie?
> A:   I don't recall.
> Q:   But you believe you told law enforcement agents about that?
> A:   Yes.
> Q:   Is that something you brought up on your own, or did they ask you about it again?
> A:   They asked me again, and I told them.
> Q:   But you don't remember when?
> A:   No, sir.

Tr. 116. In *Giglio v. United States*¸ the Supreme Court held that prosecutors must disclose

evidence that impeaches the credibility of government witnesses. 405 U.S. 150 (1972). The

government violated its discovery obligations when it failed to disclose that Ms. Mullins

admitted to lying to the FBI about a matter directly related to her credibility at trial. The

government's failure to comply with its discovery obligations put defense counsel at a

disadvantage and harmed counsel's ability to effectively prepare for cross-examination.

Had counsel known that Ms. Mullins admitted to lying to the FBI in previous interviews,

counsel could have focused on that information and cross-examination and pursued other avenues related to the witness's credibility. Unfortunately, defendants were denied that opportunity because the first time these admitted lies were disclosed was on redirect, where it was used by the government to bolster its claim that it was Mr. Mayes, not Mr. Elliott, who had the ability to control Ms. Mullins.

### E. The Government Baselessly Implied that Defendants Did Not Turn Over All Documents Responsive to the Subpoenas

On direct examination, Mr. Elliott testified that pawn shop transactions were huge for the dealership's business. On cross-examination, Mr. Behenna presented evidence that pawn shop transactions actually made up just 3.37 percent of total vehicle sales during the relevant time period, which he calculated by comparing the number of total vehicle sales to the number of pawn shop deals in Government's Exhibit 1. Tr. 479-480.

In an attempt to cast doubt on the statistics Mr. Behenna cited, Ms. Anderson intentionally elicited testimony during her cross-examination of Agent Schmitz that falsely implied Defendants did not turn over all the pawn shop deals in response to the subpoena:

> Q:   And did you review every single deal that went through the Big Red dealerships?
> A:   No.
> Q:   Why not?
> A:   The scope of our investigation primarily related to – when I got involved, primarily related to Norman Pawn & Gun, and then expanded to in-and-out transactions or dollar buybacks.
> Q:   **Do you know whether the dealerships produced every in-and-out deal to you?**
> A:   **No.**

Tr. at 1663. Ms. Anderson elicited this testimony without any basis in fact to believe, or even suspect, that Mr. Mayes had not provided all the responsive documents, and despite prior testimony from Agent Justin Lowrance confirming that he had in fact done so:

> Q:    And Chris Mayes complied with those requests?
> A:    Oh, yeah, I'm sorry, that maybe would have been a third subpoena, but, **yes, he did provide all the documents that we had asked for.**
> Q:    **He gave you everything you requested?**
> A:    **As far as I know, yes.**

Tr. at 192. On cross-examination, Agent Schmitz admitted he had no basis to believe Mr. Mayes had not produced all the documents that were requested, and said he "merely answered the question" as it was posed to him by Ms. Anderson:

> Q:    The government was eliciting to – or at least I took it this way – that you don't know whether you got all the in-and-out deals, right?
> A:    We asked for all the in-and-out deals. Whether –
> Q:    That wasn't my question.
> A:    Okay.
> Q:    You don't know, was your testimony, whether you got all the in-and-out deals, right?
> A:    That's correct.
> Q:    You could have figured out where those in-and-out deals would have been located. You could have done that through interviewing witnesses, correct?
> A:    Possibly, if there were witnesses that had that information. I mean, it's not a given.
> Q:    I agree. But maybe break it down real quick. Did you ask anyone?
> A:    Where the documents were located?
> Q:    Yes.
> A:    No.
> Q:    Okay. So if you felt you were missing deals, I mean because that's what's kind of being suggested, that there's maybe more in-and-out deals, you never looked into it to see where those documents might have been located. Fair?
> A:    I did not look into it, no.
> Q:    And you never issued a search warrant for the dealership to try to obtain these hypothetically missing files?
> A:    I never – I never said there were missing files. Ms. McKenzie (sic) asked whether we received all the files. I merely answered the question that I

> don't know because it's impossible for me to know whether or not they
> provided all the documents.
>
> Q:    And that's fair, and that's just what I want to clear for the jury. **You have
>        no idea – or no reasonable basis to think that deals were not given to
>        you that you requested pursuant to your subpoena?**
>
> A:    **I – no.**
>
> Q:    **No basis to think that?**
>
> A:    **No.**

Tr. at 1728-29. The suggestion by Ms. Anderson that Defendants did not fully comply with

the investigation was unfairly prejudicial. In reality, when the FBI requested documents

related to Tinker Federal Credit Union, Mr. Mayes voluntarily copied all the files at an

enormous expense to him. When the FBI requested documents related to Norman Pawn

and Gun and in-and-outs, Mr. Mayes personally loaded boxes of original files into the

agents' car. When the FBI interviewed Big Red employees, they told the FBI that Mr.

Mayes encouraged them to tell the truth. Josh Vanover told the FBI that Mr. Mayes "has

told me time and time again to tell the truth." Likewise, Sonia Beljean told the FBI that

Mr. Mayes told her "that we are cooperating 100% and to tell 100% the truth." Agent

Schmitz's suggestion otherwise, elicited by Ms. Anderson, was unfairly prejudicial.

### F.    The Government Baselessly and Unfairly Implied During Closing Arguments That Additional Fraud Existed

During closing arguments, Ms. Anderson noted that customers associated with one

count in the Indictment were in-and-out customers, while customers associated with three

counts were pawn shop customers. In doing so, however, she implied that there was some

additional fraud associated with the in-and-out customers that wasn't charged:

> Let's look at the jury instructions briefly. This chart in Instruction 5 shows
> you the initials, the name of the person and the counts that apply to that
> particular customer. So Tamia Gray, you know from this, she's an in-and-

out. There's no check, there's no forgery associated with Tamia Gray, **at least not charged.**

Tr. 2537. Again, there was no basis for Ms. Anderson to suggest that any additional

forgeries existed and her suggestion to that effect was unfairly prejudicial.

### G. The Government Elicited False Testimony at Grand Jury

It was discovered at trial that Ms. Anderson elicited false testimony from Agent

Schmitz at the grand jury that the default rate on the pawn shop and in-and-out loans was

higher than the default rate on other loans extended to customers at the Big Red dealerships.

At trial, Agent Schmitz admitted on cross-examination that he never even looked at the

default rate for other loans extended to customers at the Big Red dealerships and therefore

had no basis to testify that the default rate on the loans at issue was higher:

> Q:   Where we left off you indicated you did calculate the default rate for these
>       loans, meaning pawn shop deals and in-and-out deals, correct?
> A:   Yes, I believe so.
> Q:   Okay. But you did not look at the dealership generally and the records from
>       the dealership on car transactions that aren't pawn shop loans or in-and-out
>       loans, correct?
> A:   Correct.
> Q:   You never sought to calculate a default percentage for those loans, did you?
> A:   No.
> Q:   Okay. But isn't it true that you falsely told the grand jury in this case before
>       it was charged that you did calculate the default rate for those other loans and
>       they were higher for pawn shop loans and in-and-out transactions?
> A:   I don't recall. Possibly.

Tr. 1778.

### H. The Cumulative Effect of the Errors, When Weighed Against the Strength of the Evidence, Rendered the Trial Fundamentally Unfair

Standing alone, the Court may regard some of the government's errors as nothing

more than "cheap shots." At some point, however, if enough cheap shots are taken, the

cumulative effect of them can no longer be disregarded as such. Therefore, even if each of the errors herein were found by the Court to be harmless (which they are not), their cumulative effect rendered the trial unfair.

In *Berger v. United States*, 295 U.S. 78, 88-89 (1935), the Supreme Court reversed a conviction where the prosecutor's misconduct was "pronounced and persistent" and the evidence against the defendant was "weak." The Court explained:

> In these circumstances, prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. If the case against Berger had been strong, or as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might have been reached. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded.

Here, the government repeatedly introduced false, improper, and highly prejudicial evidence, followed by blatant misrepresentations to the Court about its basis for doing so. The government's misconduct was pervasive, and the evidence of Defendants' guilt was anything but overwhelming. While this is true for all Defendants, it is particularly true for Mr. Mayes because, as the Court noted, there was "little or no evidence tying him to specific transactions." Tr. 1687. In light of the strength of the evidence, which is more fully briefed in Defendants' individual Rule 29 motions, the cumulative effect of the errors upon the jury is such that they can no longer be determined to be harmless.

Criminal defendants may not be entitled to a perfect trial, but they are entitled to a fair one. The prosecutorial misconduct that was pervasive throughout this case rendered the trial fundamentally unfair and reversal is mandated.

Respectfully submitted,

/s/ Rachel N. Jordan
Vicki Zemp Behenna, OBA # 10734
Rachel N. Jordan, OBA # 32704
Wm. Brett Behenna, OBA #30485
BEHENNA GOERKE KRAHL & MEYER, PLLC
210 Park Avenue, Suite 3030
Oklahoma City, OK 73102
Telephone - (405) 232-3800
Facsimile - (405) 232-8999
vzb@lawfirmokc.com
rjordan@lawfirmokc.com
bb@lawfirmokc.com
Attorneys for Mr. Mayes

s/ William H. Bock
William H. Bock, OBA # 13888
WILLIAM H. BOCK, INC.
6402 N. Santa Fe Avenue, Suite A
Oklahoma City, Oklahoma 73116
(405) 848-5400
(405) 848-5479 Fax
billybock@wbocklaw.com
Attorneys for Mr. Mayes

/s/ Joseph G. Shannonhouse, IV
Joseph G. Shannonhouse, IV, OBA # 8117
SHANNONHOUSE LAW OFFICES, P.L.L.C.
500 North Walker, Suite C-100
Oklahoma City, OK 73102
Telephone: (405) 415-1700
FAX: (405) 415-1703
js@shannonhouselaw.com
Attorney for Mr. Gooch

/s/ Robert D. Gifford
Robert D. Gifford, OBA #17034
GIFFORD LAW, P.L.L.C.
P.O. Box 2682
Oklahoma City, OK 73101-2682
Telephone: (405) 778-4647
FAX: (877) 295-0287

Robert.gifford@giffordlawyer.com
Attorney for Ms. Wells

/s/ S. Thomas Adler, II
S. Thomas Adler, II  OBA #19997
ATKINS MARKOFF ADLER
9211 Lake Hefner Pkwy #104
Oklahoma City, OK 73120
Telephone: (405) 607-8757
tadler@amalaw.com
Attorney for Ms. Wells

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of March, 2022, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing, which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ Rachel N. Jordan

27